**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| 4BRAVA, LLC, | Civil No. 15-2744 (JRT/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| DANIEL SACHS, DSC PRODUCTS, INC., and DSC PRODUCTS HOLDING, LLC, | |
| Defendants. | |

Adrianna Shannon, **SHANNON LAW LLC**, 15105 Minnetonka Industrial Road, Suite 101, Minnetonka, MN 55345, for plaintiff.

Troy J. Hutchinson, **HUTCHINSON, P.A.**, 1907 East Wayzata Boulevard, Suite 330, Wayzata, MN 55391, for defendants.

This case involves a failed business relationship between the LeDuc family and defendant Daniel Sachs ("Sachs") to produce double-wall thermal tumblers and sell them to mass-market retailers like Wal-Mart. The entity the LeDucs formed to represent them in their half of the relationship, plaintiff 4Brava, LLC ("4Brava"), brings this action, alleging that Sachs and the two companies under his control have abused this relationship, breaching fiduciary duties to 4Brava and stealing the goodwill and customer relationships generated by the partnership between the LeDucs and Sachs. Before this Court is 4Brava's motion for a preliminary injunction, which seeks to freeze the status quo of the parties until their business dealings can be wound up. Although 4Brava makes

a compelling case as to its underlying claims, it has not shown it will face irreparable harm in the absence of an injunction. As a result, the Court will deny the motion and allow this case to proceed to subsequent stages.

## BACKGROUND

**I.     FACTUAL BACKGROUND**

In February 2014, Sachs contacted Bruce LeDuc to ask whether the LeDuc family's company, Signature USA ("Signature") would form a partnership with Sachs in which Signature would produce and supply Sachs with double-wall thermal tumblers that would in turn be sold to large mass-market retailers like Wal-Mart. (Decl. of Bruce LeDuc ("B. LeDuc Decl.") ¶¶ 5-6, July 21, 2015, Docket No. 11.) Signature. a Minnesota company that is registered formally as LeDuc Gifts & Specialty Products, LLC, is jointly owned by Le Duc's wife, Marci, and daughter, Jennea.[1] (*Id.* ¶ 3; Notice of Removal, Ex. A ("Compl.") ¶ 8, June 17, 2015, Docket No. 1.) The company owns manufacturing tools, equipment, and molds that can be used to make tumblers; some of the molds and tools are housed onsite at Signature and others are housed at its injection molding contractor, Aroplax. (Compl. ¶ 11.) Signature has been designing, manufacturing, and selling double-wall thermal tumblers to individuals and small retail establishments since 2004. (B. LeDuc Decl. ¶¶ 5, 22 (expressing concerns to Sachs about exposing Signature "to the risks required to sell to mass-market discount retailers like Wal-Mart").)

---

[1] The Court will refer to the members of the LeDuc family by their first names.

Sachs, through his company DSC Products, Inc. ("DSC"), has been selling plastic drinkware to mass retailers, such as Walgreens, Bed Bath & Beyond, CVS, and Target, since 2004. (Decl. of Daniel Sachs ("Sachs Decl.") ¶ 4, Aug. 12, 2015, Docket No. 26.) Sachs has sold double-wall drinkware, such as the tumblers at issue here, to retailers for over a decade. (Supplemental Decl. of Daniel Sachs ("Second Sachs Decl.") ¶ 2, Aug. 17, 2015, Docket No. 31.) Sachs and DSC have had an ongoing customer relationship with Wal-Mart since 2010. (Sachs Decl. ¶ 4.) Sachs and DSC also own the trademark "American Tumbler." (Compl. ¶ 16.)

Sachs and Bruce did a presentation in August 2014 to Wal-Mart buyer Jason Rogers, after which Bruce alleges that Sachs first broached the subject of a formalized partnership between Signature and DSC. (B. LeDuc Decl. ¶¶ 15-22.) Sachs worked to prepare Bruce for the meeting with various questions, based on his past experience. (*Id.*, Ex. 6.) His Wal-Mart sales consultant, Bryan Phillips, also attended. (*Id.*) They followed up with emails to Rogers, reiterating the large potential market for plastic tumblers. (*Id.*, Ex. 8.)

On September 11, 2014, following the presentation, Sachs informed Bruce that Wal-Mart had committed to purchasing 24 tumblers each for 200 stores; the parties labeled this order "Flow 1." (*Id.* ¶ 24.) In order to produce these orders, Signature needed to modify and update its molds, with an initial estimated cost of $30,000 to $40,000. (*Id.* ¶¶ 27-28.) Bruce and Sachs agreed that Signature could not bear this cost alone, and, over time, Sachs forwarded some funds to Signature to pay for the mold modifications, tools, and equipment. (*See, e.g.*, *id.* ¶¶ 31, 46-47, 58, 72-74, 98, 117, 120;

*see also id.*, Exs. 17, 20, 24, 33, 36.) Bruce understood that Sachs was helping to pay for the updates to help cover the risk to Signature, but not to be a part-owner of the molds. (*Id.* ¶ 31.) Instead of Sachs partially owning the molds, the LeDucs and Sachs agreed that, if the partnership collapsed within three years, Sachs would receive some of his funds back, at a decreasing amount as time progressed. (*Id.* ¶¶ 53-54, 89, 110.)

Sachs also moved forward on pitching Wal-Mart with an idea for another order, called "Summer Hotspot," which he said would not be due for a year or more. (*Id.* ¶¶ 37-38.) This order would be called "Flow 2." (*Id.* ¶ 39.) Wal-Mart moved much more quickly than anticipated on this order, however, meaning that both Flow 1 and Flow 2 would be due to Wal-Mart in the spring of 2015. (*Id.* ¶¶ 62-63, 79.)

In order to more formally organize their relationship, Sachs and the LeDucs each created DSC Products Holding LLC and 4Brava respectively.[2] (*Id.* ¶¶ 57-59; Decl. of Jennea LeDuc ("J. LeDuc Decl.") ¶ 11, July 21, 2015, Docket No. 12; Compl. ¶¶ 14-19.) On November 26, 2014, DSC and 4Brava then formed Three Two Eight, a Minnesota LLC that would serve as the lead company and bridge between DSC Products Holding and 4Brava, and consequently between Sachs and the LeDucs. (B. LeDuc Decl. ¶¶ 57-60). DSC Products Holding and 4Brava served as the members/owners of Three Two Eight. (*Id.* ¶ 60.) Bruce alleges that the parties agreed to a 50/50 ownership structure of Three Two Eight, but that they also agreed that Bruce, Jennea, and Sachs would each be managers of Three Two Eight and would operate the company by majority vote. (*Id.*

---

[2] Sachs was the member/owner of DSC Products Holding, while Jennea and Marci were the members/owners of 4Brava. (B. LeDuc Decl. ¶ 57, 59.)

¶ 88.) The partnership would split all expenses and profits 50/50, equally between Sachs and the LeDucs. (*Id.* ¶ 50.) According to Bruce, the parties agreed that the LeDuc family's attorney would prepare a contract/operating agreement to memorialize these discussions and govern the partnership. (*Id.* ¶ 49.) The agreement governing Three Two Eight was forwarded to Sachs on January 15, 2015. (*Id.* ¶ 82.) A lease agreement between Three Two Eight and Signature's molds was also forwarded to Sachs on February 11, 2015. (*Id.* ¶ 91.) The parties discussed the documents on numerous occasions, but never signed them. (*Id.* ¶¶ 64, 84-97, 99-100, 109-12, 134.) Sachs later negotiated agreements with marketing agencies who would act as sales representatives to Wal-Mart, Menards, and Target, ostensibly on behalf of Three Two Eight. (*Id.* ¶¶ 114-16.)

It proved to be more difficult than expected to let Three Two Eight serve as the lead company in the parties' business relationship. Aroplax, for example, refused to contract solely with Three Two Eight, since it was new and had no credit history. (*Id.* ¶ 76-78.) Consequently, Signature acted as a guarantor that allowed Three Two Eight to contract with Aroplax. (*Id.* ¶ 76-78, 107.) Throughout this process, Bruce alleges that he repeatedly expressed concerns regarding the risk Signature was taking on; he asked Sachs on numerous occasions to put Three Two Eight's name on the Wal-Mart purchase orders and to deposit all payments in a Three Two Eight bank account. (*Id.* ¶¶ 22, 33, 40, 43, 45, 66, 77, 103, 107.) According to the LeDucs, Sachs promised to do so repeatedly, but never followed through. (J. LeDuc Decl. ¶¶ 21-23.) Indeed, as of the hearing on this motion, the LeDucs contend that Sachs has still not provided any information about the

status of the Wal-Mart payments. (B. LeDuc Decl. ¶¶ 133, 143.) At various times, Sachs, and his wife, also expressed concern over the agreement, claiming that it was unfair for Sachs to fund the updated molds but not have any ownership of them. (*Id.* ¶¶ 93-96.) According to Sachs, his understanding was that "each party would equally own the molds needed to produce the tumblers." (Sachs Decl. ¶ 7.) The parties also appeared to agree that the tumblers they were jointly producing and selling would bear the "American Tumbler" name, but they could not agree on whether that name would belong to Three Two Eight or would belong to Sachs and be rented by Three Two Eight. (B. LeDuc. Decl. ¶ 111.)

Eventually, the agreement collapsed and in May 2015, Sachs informed the LeDucs that he no longer wanted to partner with them. (*Id.* ¶¶ 126, 128, Ex. 39.) Nevertheless, no formal dissolution has occurred. (*Id.* ¶¶ 136, 144); *see also* Minn. Stat. § 322B.81. Sachs contends no dissolution is necessary because the LLC was never fully formed. (Sachs Decl. ¶¶ 19-20.)

In the weeks preceding and following the dissolution discussion, the LeDucs allege that they discovered that Sachs was operating behind their backs, with the intention of reaping all of the benefits of their brief partnership. As noted above, they contend that despite Sachs's assurances, Three Two Eight did not receive expected payments from Wal-Mart on the expected dates. Eventually, Three Two Eight no longer had sufficient funds to pay Aroplax for its production of tumblers, and production has ceased on all work related to Three Two Eight and all of Signature's other work with Aroplax. (B. LeDuc ¶ 139.) The LeDucs also allege that Sachs misled them about whether

Menards would execute a purchase agreement with Three Two Eight and that, despite his assurances to the contrary, he put the agreement with Menards in the name of DSC, not Three Two Eight. (*Id.* ¶¶ 129, 142.) The LeDucs also contend that Sachs started to demand of Aroplax that it continue manufacturing tumblers because Sachs owned the molds, and not Signature or 4Brava. (*Id.* ¶¶ 127, 130, 137.) He allegedly stated that he would not pay Aroplax for work already completed until it acknowledged that he owned the molds and tools. (*Id.* ¶ 138.) The LeDucs also alleged that Sachs lied about adding Jennea as a signatory to a joint account for Three Two Eight at Chase Bank. (*Id.* ¶ 131.) According to the LeDucs, they have been forced to pay the majority of the expenses Three Two Eight incurred due to the Wal-Mart order, and Sachs has only deposited $200,000 into Three Two Eight's bank account of the $1.6 million he likely received. (*Id.* ¶ 140.)

According to Sachs, this case essentially involves a failure of two parties to reach a final agreement on a business relationship. (Sachs Decl. ¶ 17-33.) He notes that he never signed a non-compete agreement and never agreed to sell tumblers only through Three Two Eight. (*Id.*) Moreover, he alleges that the LeDucs went back on a promise he alleges they made to share ownership of the molds with him. (*Id.*)

## II. PROCEDURAL HISTORY

4Brava filed the complaint in this case on June 3, 2015 in state court.[3] (Compl.) Sachs removed it to federal court. (Notice of Removal.) The complaint alleges that Sachs, DSC, and DSC Products Holding acted dishonestly toward Three Two Eight and 4Brava, seeking to gain their help initially, but ultimately taking their customer relationships. Specifically, 4Brava alleges several claims, including breach of fiduciary duties, misrepresentation/fraud, civil theft, conversion, accounting, illegal distribution, statutory dissolution, unjust enrichment, promissory estoppel, and breach of contract. (Compl. ¶¶ 88-141.)

4Brava then filed a motion for a preliminary injunction, which is before the Court at this stage. (Mot. for Prelim. Inj., July 21, 2015, Docket No. 10.) In that motion, 4Brava argues that it is likely to succeed on at least some of its claims – 4Brava cites specifically its claims for breach of fiduciary duty, misrepresentation/fraud, illegal distribution, promissory estoppel, and unjust enrichment. 4Brava also asserts that it will suffer irreparable harm in the absence of an injunction. 4Brava argues that it will lose the goodwill it has built up with customers like Wal-Mart over the course of its relationship with Three Two Eight and DSC Products Holding. 4Brava seeks to freeze both sides from taking any further action (i.e., competing to sell double-wall tumblers to mass-market retailers), until Three Two Eight is formally dissolved and wound up. Specifically, 4Brava asks the Court for the following detailed injunction:

---

[3] The LeDucs filed a related case, also before this Court, with Signature as the plaintiff. (*LeDuc Gifts & Specialty Prods., LLC v. Sachs*, No. 15-2743.)

1. Enjoin Defendants from directly engaging in any aspect of manufacturing or selling double wall tumblers to mass-market retailers until eight months after completion of the wind-up of Three Two Eight, and from providing any assistance or information to any other party to do the same;

2. Enjoin Defendants from contacting Three Two Eight's vendors and service providers in an effort to secure agreements with them to assist with any aspect of manufacturing or selling double wall tumblers to mass-market retailers until eight months after completion of the wind-up of Three Two Eight;

3. Enjoin Defendants from directly or indirectly creating, designing, building, purchasing, shipping, or operating any equipment or molds used or intended to be used to manufacture or fabricate double wall tumblers until eight months after completion of the wind-up of Three Two Eight;

4. Direct Defendants to transfer all vendor accounts with Walmart, Menards, and any other mass-market discount retailers for the sale of double wall tumblers to Three Two Eight's name, and transfer payments, past and future, for all orders from Walmart and Menards and any other mass-market discount retailer purchasing double wall tumblers since November 2014 to the Three Two Eight bank account;

5. Direct Defendants to immediately deliver to 4Brava all information related to the manufacture, production, shipping, sales, revenue, and any other goods, services, contracts, and/or financial information related to Three Two Eight and/or the sales of double wall tumblers since the inception of the partnership with 4Brava in November 2014; and

6. Order dissolution of Three Two Eight, LLC and commencement of court-supervised wind-up of the business's affairs.

(Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Mem.") at 2-3, July 21, 2015, Docket No. 18.)

# DISCUSSION

## I. STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). The Court must consider four factors in determining whether to grant preliminary injunctive relief: (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of harms as between the parties; and (4) the public interest. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. The party requesting injunctive relief bears the complete burden for showing the above factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## II. IRREPARABLE HARM

To obtain a preliminary injunction, a plaintiff must show not only that irreparable harm is possible but that it is "**likely** in the absence of an injunction." *Winter,* 555 U.S. at 22 (emphasis original). The Supreme Court has made clear that a "'possibility' standard is too lenient." *Id.* Although courts frequently "focus on likelihood of success on the merits as a threshold issue" when evaluating preliminary injunction motions, *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732 n.5 (8th Cir. 2008), it is not

always determinative or even the most appropriate factor for a court's attention. "Indeed, in some cases, lack of irreparable injury is the factor that should begin and end the *Dataphase* analysis." *Id.* "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc.,* 346 F.3d at 844 (citing *Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir. 1996)).

Here, the Court concludes that 4Brava has failed to show irreparable harm and that this case is one in which the irreparable harm factor should "begin and end the *Dataphase* analysis." *Rounds*, 530 F.3d at 732 n.5. As a result, the Court will deny 4Brava's motion for a preliminary injunction. 4Brava's primary interest appears to be in regaining the money it has spent on Three Two Eight's production of tumblers for Wal-Mart. Money owed to 4Brava, however, is easily quantifiable and does not support the contention that it will face irreparable harm absent an injunction. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.").

4Brava's key irreparable harm argument, then, is that without an injunction it will lose the customer relationships and goodwill that it developed while securing, along with Three Two Eight and Sachs, contracts with Wal-Mart and Menards. (*See* Supplemental Decl. of Jennea LeDuc ("Second J. LeDuc Decl.") ¶¶ 38-42, Aug. 14, 2015, Docket No. 28.) 4Brava alleges that its reputation has suffered serious damage not just in terms of its customers, but also as to its vendors and third-party sales representatives. (*Id.* ¶ 38.)

The Court is not persuaded by this argument, however. 4Brava is a new entity, registered less than a year ago, in November 2014. (J. LeDuc Decl. ¶ 11.) As part owner of Three Two Eight, it has helped market tumblers to mass-market retailers like Wal-Mart, and it has done so primarily through relationships brought to Three Two Eight by Sachs. (B. LeDuc Decl., Ex. 8.) Indeed, Bruce expressed concern to Sachs about selling to mass-market retailers, something Bruce and Signature had not done before, further demonstrating that Sachs was the key conduit to these large stores. (*Id.* ¶ 22.) Additionally, although it is clear that Bruce was a part of the initial meeting with Wal-Mart, and that Bruce met alone with the sales representative for Menards, Bruce's own declaration also makes plain that Sachs took the lead in marketing the Summer Hotspot order to Wal-Mart – Three Two Eight's largest order. (*Id.* ¶¶ 38-39, 79, 121, Exs. 38-39.) Moreover, evidence in the record shows that, if anything, Sachs and his sales associates relied on the LeDucs' goodwill and reputation, and Signature's, not 4Brava's. (*Id.*, Ex. 8 (highlighting to Rogers the knowledge and expertise that Bruce brought regarding tumblers).) These facts lead the Court to conclude that 4Brava has not demonstrated sufficiently that, during its short existence, it has developed the sort of reputation, relationships, and goodwill that will be irreparably harmed in the absence of an injunction that freezes Sachs's and DSC's actions. At best, any such harm is highly speculative, and such speculation does not show irreparable harm. *Plasti Dip Int'l Inc. v. Rust-Oleum Brands Co.*, No. 14-1831, 2014 WL 7183789, at *7 (D. Minn. Dec. 16, 2014) ("[The plaintiff's] claim of injury to goodwill is, at this stage of the case, speculation and speculation is not enough to show irreparable harm."); *Luigino's, Inc. v. Peterson*,

No. 00-1246, 2000 WL 35610158, at *5 (D. Minn. Dec. 13, 2000) ("Such speculative harm does not justify the imposition of injunctive relief.").

The cases 4Brava cites also demonstrate that there is no irreparable harm in this case. Many of the cases involve an employee leaving an employer and breaching a non-compete clause, or otherwise continuing to falsely hold himself out as an employee of the plaintiff employer. *See, e.g.*, *Lifetime Fitness, Inc. v. Wallace*, No. 12-740, 2012 WL 1517262, at *1-*2 (D. Minn. Apr. 30, 2012) ("The Court finds that [the employer] is threatened with irreparable harm because [the former employee] is trading on good will established while working at [the employer] by contacting his former [clients], and he has personal influence over [the employer's clients] resulting from the [working relationship he had with them while at the employer]."); *Paradata of Minn., Inc. v. Fox*, 356 N.W.2d 852, 854-55 (Minn. Ct. App. 1984).

In other cases, defendants co-opted a plaintiff's trademark or copyrighted information, or otherwise took a plaintiff's name and likeness in an attempt to trade on their reputation and good will. *See, e.g.*, *Wood v. Kapustin*, No. 13-1495, 2013 WL 3833983, at *1, *3-*4 (D. Minn. July 23, 2013) (in a case in which the defendant was using the plaintiff attorney's logo and likeness, stating that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury" and that "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars"); *Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners*, 829 F. Supp. 2d 836, 845-46 (D. Minn. 2011) (concluding that the plaintiff restaurant chain had demonstrated irreparable injury where the defendant, a former franchisee of the chain, was using the

restaurant's brand and trademark after the termination of the franchise agreement; noting that the plaintiff's marks were "widely known" and "associated exclusively" with restaurants approved by the chain).

This case is markedly different. Sachs is not trading on the goodwill of a well-established brand or, as in the non-compete clause cases, stealing relationships he **only** gleaned through his relationship with 4Brava and Three Two Eight. Instead, he is pursuing drinkware opportunities with customers it appears he had before his relationship with 4Brava. Sachs is not stealing 4Brava's or Three Two Eight's goodwill with customers; indeed, unlike the restaurant chain in *Buffalo Wild Wings*, neither 4Brava nor Three Two Eight has a significant, long-standing, and widely known reputation for Sachs to take. In sum, the Court concludes that 4Brava has not established irreparable harm and, without reaching the remaining preliminary injunction factors, will deny the injunction motion. *See, e.g.*, *Doe v. Jesson*, No. 15-2639, 2015 WL 4067170, at \*3-\*4 (D. Minn. July 2, 2015) (denying a preliminary injunction motion based on the irreparable harm factor alone).

It is important to note, however, that the Court does not take a position on 4Brava's likelihood of success on the merits. Indeed, 4Brava may well succeed on some of its underlying claims against the defendants. For example, while Sachs contends that no functioning organization or agreement ever existed between 4Brava and DSC Products Holding, and consequently that neither he nor either DSC entity owes any fiduciary duty, he also cites no Minnesota case law or statutory authority for that proposition. (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Defs.' Mem.")

at 19-21, Aug. 12, 2015.) Moreover, the record shows that Sachs engaged in significant activity on behalf of and as a representative of Three Two Eight; curious activity if Three Two Eight never existed. (*See, e.g.*, Second J. LeDuc Decl., Ex. 67.) Moreover, whatever the requirements of forming an LLC, Minnesota law states that, at minimum, a **partnership** is formed quite easily. Minn. Stat. § 323A.0101(8) ("'Partnership' means an association of two or more persons to carry on as co-owners [of] a business for profit."); (*see also* B. LeDuc Decl., Ex. 39 (estimating the profits that both 4Brava and DSC Products Holding made from sales to Wal-Mart).).

To the extent Sachs argues 4Brava lacks standing to sue, 4Brava correctly notes that members of LLCs in Minnesota do owe fiduciary duties to other members. *Weiner v. Naegele*, No. 11-855, 2012 WL 2906299, at \*1, \*4-\*5 & n.6 (D. Minn. July 16, 2012). Finally, even if 4Brava and Three Two Eight did not have long-standing customer relationships and goodwill, the defendants may still owe a duty of loyalty, along with other fiduciary duties, and it may be possible to allege successfully that the defendants usurped a corporate opportunity that belonged to Three Two Eight. *See generally* Minn. Stat. § 322B.833, subd. 4; *Weiner*, 2012 WL 2906299, at \*5-\*7; *Miller v. Miller*, 222 N.W.2d 71, 78-79 (Minn. 1974). In other words, even if Sachs had long-standing relationships with companies like Wal-Mart, the defendants could still enter into a partnership that would have a right of first refusal as to opportunities with existing and new customers. Similarly, 4Brava may be able to prevail as to its other fiduciary duty claims, and its non-fiduciary duty claims. Again, the Court is not deciding whether 4Brava has shown a likelihood of success on the merits, but merely noting that 4Brava

may have plausible claims. The Court will deny the injunction motion in order to allow this case to proceed. The parties are ordered to contact Magistrate Judge Rau to establish a schedule.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that 4Brava's Motion for a Preliminary Injunction [Docket No. 10] is **DENIED**. The Clerk of Court shall enter judgment on this motion.

DATED: August 24, 2015  
at Minneapolis, Minnesota.

                                                      s/ John R. Tunheim  
                                                      JOHN R. TUNHEIM  
                                                             Chief Judge  
                                                   United States District Court